who consented to the clinical findings, but disavowed them because she found they were inconsistent with Dr. Fernandez's claims to be a psychiatrist. But her notes also commented that both sources were one-timed in dating doctors. So, in the mail, she never set forth any real inconsistency between the truncations of the two consulted doctors and the evidence from Dr. Fernandez and Ms. McGarrah's treating practitioners. And even in the mail, she failed to set forth the words that were consistent with Dr. McGarrah's treatments and started dating the patients. Dr. Fernandez also argued that Dr. Fernandez's recommendation to open up the scope of the patients. Dr. McGarrah also drafted a five-page presentation today. The mail she found in all the annotations that Ms. McGarrah had or that she sent to all the patients. Dr. Fernandez also argued that Dr. Fernandez's recommendation to open up the scope of the patients. Dr. Fernandez also argued that Dr. Fernandez's recommendation to open up the scope of the patients. consistent with the findings of the treatment practitioners, Dr. Fernandez. The records show that Ms. McGarrah started seeing Dr. Fernandez in October of 2009. Her date of birth was December 31st, 2009. And the costs shown in the records show that her stress and depression after living in in October of 2008. It shows she had delayed behavior along with feelings of hopelessness, helplessness, being overwhelmed, PTSD, irritability, some agitation, all prior to her day-to-day chores. It's confirmed that her urination, she had increased urination and turbulence, anxiety, poor sleep, some suicidal ideation, dangerous thoughts. And in Commissioner's Brief, page 29, they did do a very small amount to tailor these notes. They omit many important things. They omit the fact that if she were in 2010, right after her DOI, 40 days or one day after her DOI, she had poor concentration. We should note that by Dr. Fernandez that in April of 2010, her doctor added additional medications like Clonopin, which is for stress or anxiety. She ignored many of the measures noted in August of 2010. She had increased anxiety. At times, she was overwhelmed, can't do anything, doesn't know what to do first. Accuracy in thoughts, perspective. She was started on a new medication, fentanyl, a menthol for her resistance. She still had increased anxiety in October of 2010. These are all Dr. Fernandez's notes. Her scales show that they're not consistent with the intentions of the two conservative health practices she had on her own. She did think that, but she also noted that she had inadequate control of her medications. Inadequate response to medications was noted multiple times. This is the final finish strip with notes in large and challenging prongless. I'll now show you the next slide. If you want to go back to the notes. Those are those that are on the left hand side and the ones are on the right. They're on page what looks like 364. Ages 646, 648, 649, 650, 653. And on the left hand side are those notes. I'll now show you a list of medications. Patient controlled medication. And Dr. Fernandez, the boss of NMS, showed such helpful adequate controlled medication. Overruling and miscellaneous response to medication. And the last page is on overruling medication. That's all I can put in this page. So down to March 8, 18, 2010, Dr. Fernandez notes the patient's anxiety was better that day. The patient's moderate and it was improved. And the nurse puts a definition on it. And she gives a few days off. We'll let you know our characteristics for the rest of page 63. It doesn't say just that. It said it was better, but it had no evidence. She said last week she had increased anxiety, but she's better this week. That's what it said. But she still had moderate anxiety. This is a collective review of her. So she's been asked for response to her medication. What are all the things that I address? Someone who is not responding to medication. She's changing. She's adding medications. She's discontinuing medications. She has a response all the way through March 2010 and after response to medication. August 2010 and after response to medication. In fact, that same person that we just mentioned, Your Honor, March 2010, she has a six-months in-house medical school response to her medication on it. The following is the part that we say that the person consistently reported increased anxiety in the last six months. It did not change the fact that she was finding her inconsistency with the treatment. Psychiatrists have told me, you're at your own risk. You're not achieving the recovery goal. So that's somewhat what I thought you were saying, Your Honor. There's another doctor who's been on the record. He's a neurologist, Dr. A. Santos. This doctor saw Ms. Rivera on November 6, 2009, prior to her DLI, and Dr. Santos also stated chronic stress and depression. We believe that supports the opinions of Dr. Colon as well as Dr. Downey. So it's, of course, decision-makers that are very important. What's the data, Your Honor? Okay, thank you. Okay. You have to look at all the records. You can't really just look at one statement on the record or one piece on the record. Okay. The information we have so far is that she fell in January and was around after July. Okay. The evidence of obstacles in her neck, she had a sense of anxiety, a time to overwhelm, a self-absence, a time to overwhelm, anything that's not what she was first raising thoughts for herself to do. Started her medication up on my phone in August of 2010. She never said anything about she actually diagnosed her with post-traumatic stress disorder and with depression, and never said anything. She was never mentioned in Dr. Fernandez's notes, as many as she found at any time of her life or so. It doesn't matter. It wasn't Dr. Fernandez's notes. It came from my records. It was all of those times I was reading to you that are in her records. There are some issues with her family. It's illicit. It operates. The findings are mental status examinations, psychiatric findings that are consistent with or in reference to the family. There have been some notes in the paramedics' notes.  The paramedics' notes. So there were some notes that failed, and it seemed that she was the first one to call the police on me. You have to look at these notes very carefully. We have acceptable medical sources, and we have not acceptable medical sources. The treasures are acceptable medical sources. The therapist is not an acceptable medical source. The therapist cannot diagnose the condition. Only a capable medical source can diagnose the condition, and that's what Dr. Fernandez has done. The paramedics have diagnosed her. Most of the therapists in America are different. Information that was useful to the self-diagnosed. I think the speech of a self-diagnosed is not perfect, but the point is that you have to look at a psychiatrist's notes, and they're very clear. The big notes have a lot of information in them. Unfortunately, Dr. Nehru, when he was thinking about post-hospitalization, a week since the notes were put together, showed a lot of schizophrenia symptoms. It sometimes shows better. But it's very important that she never had full, full overtake of her symptoms by medication. A neurology psychiatrist can't be out of control with medication for a very long time. For an office, the longest five-star record is February 2011. It's a treat that I've established. She can't be out of control over her symptoms with medication. It is also distributed with the consultative doctor's attendance. So, certainly her condition did wax emotional, but this was foretold in the Garrison case in 2014, and she will be able to reject allegations of acceptance by an unlawfully enforced treatment. Now, it's also important that both Dr. Kalman and Dr. Cohen agree that Mr. Carroll is more sensitive than he has been. In fact, we submitted a set of records specifically that both stated that she was at her most simple, one-tier repetitive tasks. Both doctors pointed that out in their end-of-note. And furthermore, that the commissioner noted, she's going to have to bring both Dr. Carroll and Dr. Cohen agree to treat her for a simple repetitive task. But in fact, I find her sensitive in that it's more than simple. Simple repetitive tasks on page 438, served by Dr. Kalman, and page 660 by Dr. Cohen. And in the supplemental story, the commissioner gave the court a few new cases. They referenced the Rouse position, which we brought last year. Rouse was the commissioner who published the case by the court, and we submit that case as a simple, repetitive task. And those are not consistent with Level 2 reading ability. And our second point here is that the ALJ failed to ask something like a technical question to the location. That's where I had no medical indications that I had a technical question at all. And that she had, in the own evidence of her immediate acceptance, submitted several repetitive tasks, one two-step tasks. And in the Rouse case, they said that was not consistent with reading two double-tasks at all three tasks. The commissioner didn't see it, or reading two tasks. That's on page 46 of their brief. And therefore, it's not harmless error for the ALJ to have not included any medical applications and hypothetical questions at the ALJ. But in one two-step task, the ALJ also could have been different, not a simple reading ability. So, let's take a look at the various burdens that she's faced and faced. First of all, claims have the burdens established for September 31st, 2009, her D-class discharge that she will be going to see in the New York court. The claimed cases that she has encountered since this morning makes her clear that this were her mental impairments. She had this prior D-class discharge since the claim started a couple of months before her discharge set up this fire. And most people don't see any certain symptoms that are improved with medication, and then they're asked to go to therapy or counseling. And then once the claimant moves into the counseling, it was a D-class discharge that she continues to do certain programs. After a D-class discharge, a D-class discharge often has certain situational anxiety situations that is usually critical for exacerbating her symptoms. But if you look at the situation of mental stressors, there's two doctors in the claim who have helped the ARK clients examine the claimant about a year or more after a group set up this fire. And after those different situational stressors and risks, so they move patients into homes, homes for security, and homes for conditioning. And would the claimant know it's an indication of how she's responding before a D-class discharge is initiated? That's correct. That's correct. If you read it in these data, it's possible that some of the symptoms were improved. The claimant knows that most of the symptoms that the workers are experiencing don't always come immediately from treatments, but they can also use time steps to see if they've improved. If she has to find a treatment that is not severe, it may be that the medication is not good for her. If it's too severe, it's too severe. But if it's early for medication to be severe, that's a good thing, such as if the medication is consistent. If the medication is not as good, that's a problem, that's a problem. But if it's not as good, that's a problem, that's a problem. And then, fortunately, if you see a client who's been on treatment for a number of years, and they're experiencing a lot of pain, you should be able to identify if there's a change in the patient's symptoms. Absolutely. Your Honor, we are currently looking into a 30-year-old and a 19-year-old patient who has been on more than 30 tests. But the error was obvious. First of all, we know that the burden is very high on the patient. It's actually the highest of pain per year. And we would like to recommend that she watch what would be afforded to her shortly before her hand can hurt. And shortly before her hand can hurt, if this is the first time that you've come to court and you need some support, please let us know. Dr. Powell, that's full and valid claim to one of 62 tests, and it's a ground that the agency needs those jobs. I would never call in denying the claim to one of 62 tests. It's significant, it's more than 50 tests, and it's 40 grounds. We noted that there was, it seems to be the situation noted that in our agencies, we have a non-religious abundance of single or higher tests with one or two statuses. And in the 40 grounds, we have been reported that there are a number of unpublished disease and virus scores, and some authority from surrogates and public district physicians that said that single or higher tests is considered reasonable As we have here, it says Exactly. And actually, you know, that's because, and we can point to that because of what happens to poor kids. We know that those tests are smaller on stability and they're specifically for pre-preparation level two. That's fine, but you're going to have to give them all levels We can't do that, because there's so much scary things that happen to people. And it's made so difficult to get caught up in single grounds if more of that involves single top, and people are going to have some periods where they're going to feel there's a difference in understanding, figuring out, and remembering their single tests. So that's the secret more than just taking any of the other small test that's also consistent and has these scores, and optimizing those things against ground tests, against single tests, all of those things are going to have a lot of impact on the test result. So, I hear a lot of people talking about the cost of those tests, but in general, in my area of work, kids, teens,  teens, teens, teens, teens, teens, teens, teens, teens, teens, teens, teens, teens, teens, teens, teens, kids, teens, teens, teens, teens.  hörtung Ver Sikhs discover accurately are in    physically     So, those skills are going to play a big role in maintaining the revitalizing effect in the brain  strengthening the base and that's only a couple of them have that skill there in some areas that's easy to do in speech. I don't have any thoughts that relate to the issue that we're talking about today. I don't have any that relate to the    talking about today. I that relate to the  that we're the  that we're about. I know any relate to the issue that we're about. I don't have any relate to the issue that we're about. I don't have any relate to the issue   about. I don't have any relate to the issue that we're about. I don't have any relate to  issue that        to the issue that we're about. I don't have any relate to the issue that we're about. So I don't have any relate to the issue that we're about. Thank you.
judges: Schroeder, Kozinski, Trott